No. 16-1091

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

_____

**JEFFREY BRILL**,
*Plaintiff - Appellant*,

v.

**TRANS UNION LLC**,
*Defendant - Appellee*.

_____

On appeal from the U.S. District Court for the Western District of Wisconsin
(Hon. Stephen L. Crocker, U.S. Magistrate Judge)

_____


**APPELLANT'S OPENING BRIEF**


Joel Winnig
ATTORNEY JOEL WINNIG
414 D'Onofrio Drive, Suite 120
Madison, WI 53719
(608) 829-2888

Scott Michelman
Julie A. Murray
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
smichelman@citizen.org

*Counsel for Plaintiff-Appellant Jeffrey Brill*


April 18, 2016

CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: <u>16-1091</u>

Short Caption: <u>Brill v. TransUnion</u>

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable  if this form is used.

    [  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Jeffrey Brill

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Attorney Joel Winnig, 414 D'Onofrio Drive, Suite 120, Madison, WI 53719

Public Citizen Litigation Group, 1600 20th St. NW, Washington, DC 20009

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES ................................................ iv

INTRODUCTION ........................................................1

REQUEST FOR ORAL ARGUMENT ....................................2

STATEMENT OF JURISDICTION........................................3

ISSUE PRESENTED ......................................................3

STATEMENT OF THE CASE..............................................4

SUMMARY OF ARGUMENT ..............................................8

STANDARD OF REVIEW ................................................11

ARGUMENT ..............................................................11

    I.   UNDER THE FCRA, PRIMARY RESPONSIBILITY FOR THE ACCURACY OF CREDIT REPORTS LIES WITH CONSUMER REPORTING AGENCIES...............................11

    II.  WHEN A CONSUMER DISPUTES THE RELIABILITY OF THE SOURCE OF CREDIT INFORMATION, A REASONABLE REINVESTIGATION OFTEN REQUIRES MORE THAN PARROTING THE ORIGINAL SOURCE ...................15

    III. A JURY COULD FIND THAT TRANS UNION'S REINVESTIGATION WAS NOT REASONABLE...............................22

        A. Brill's Dispute Called Toyota's Reliability Into Question, The Risk Of Harm To Brill Was Clear, And The Cost Of Reinvestigation Was Low ...............................................22

        B. The District Court Erred In Relying On Cases In Which Reinvestigation Could Not Have Resolved The Dispute .................27

CONCLUSION ...................................................................................................31

CERTIFICATIONS ...........................................................................................33

STATUTORY APPENDIX .................................................................................34

APPENDIX ........................................................................................................A1

# TABLE OF AUTHORITIES

## CASES

*Bonte v. U.S. Bank, N.A.*,
   624 F.3d 461 (7th Cir. 2010) ................................................................4, 11

*Brill v. Toyota Motor Credit Corp.*,
   No. 3:15cv00068 (W.D. Wisc.) .........................................................6

*Bryant v. TRW, Inc.*,
   689 F.2d 72 (6th Cir. 1982) .............................................................17

*Carvalho v. Equifax Information Services, LLC*,
   629 F.3d 876 (9th Cir. 2010) ...........................................................29

*Cushman v. Trans Union Corp.*,
   115 F.3d 220 (3d Cir. 1997) .......................................... 15, 16, 17, 18, 19, 30

*DeAndrade v. Trans Union LLC*,
   523 F.3d 61 (1st Cir. 2008).........................................................27, 28

*Dixon-Rollins v. Experian Information Solutions, Inc.*,
   2010 WL 3749454 (E.D. Pa. Sept. 23, 2010)............................................5, 18

*Firestone Finance Corp. v. Meyer*,
   796 F.3d 822 (7th Cir. 2015) ..........................................................11

*Henson v. CSC Credit Services*,
   29 F.3d 280 (7th Cir. 1994) ....................................................*passim*

*Johnson v. MBNA America Bank, NA*,
   357 F.3d 426 (4th Cir. 2004) ......................................................20, 21

*Pinner v. Schmidt*,
   805 F.2d 1258 (5th Cir. 1986) ...................................................13, 21, 22

*Stevenson v. TRW Inc.*,
   987 F.2d 288 (5th Cir. 1993) ................................................17, 20, 26, 30

*Wantz v. Experian Information Solutions*,
    386 F.3d 829 (7th Cir. 2004) ..........................................................................30

## STATUTES

15 U.S.C. § 1681 ..........................................................................11, 13, 17, 31

15 U.S.C. § 1681e(b) ..........................................................................14

15 U.S.C. § 1681i(a) ..........................................................................*passim*

15 U.S.C. § 1681n ..........................................................................14, 15

15 U.S.C. § 1681o ..........................................................................14, 15

15 U.S.C. § 1681p ..........................................................................3, 14, 15

15 U.S.C. § 1681s-2(b) ..........................................................................21

28 U.S.C. § 636(c) ..........................................................................3

28 U.S.C. § 1291 ..........................................................................3

28 U.S.C. § 1331 ..........................................................................3

## RULES

Fed. R. App. P. 4 ..........................................................................3

7th Cir. R. 32.1 ..........................................................................8, 24

## MISCELLANEOUS

Consumer Financial Protection Bureau, *Key Dimensions and Processes in
    the U.S. Credit Reporting System* (2012) ..........................................1, 5, 11, 12

## INTRODUCTION

In the modern U.S. economy, a good credit report is essential to consumers seeking credit cards, car loans, home loans, rental housing, bank accounts, insurance, employment, and more. At the heart of the credit reporting system, and thus of critical importance to the economic lives of hundreds of millions of Americans on whom credit files are maintained, are the three major consumer reporting agencies, Equifax, Experian, and Trans Union.[1] When these agencies' credit reports about an individual contain inaccurate information, that individual can face serious economic consequences. To mitigate the risk of inaccurate and detrimental reporting, Congress included in the Fair Credit Reporting Act (FCRA) the requirement that consumer reporting agencies "conduct a reasonable reinvestigation" of disputed information in a consumer's credit report. 15 U.S.C. § 1681i(a)(1)(A).

Defendant Trans Union reported that plaintiff Jeffrey Brill owed a delinquent debt on a car lease. Brill disputed the debt and provided Trans Union with documentation strongly suggesting that his signature on the lease had been forged by his ex-girlfriend. By way of "reinvestigation," Trans Union sent an

---

[1] *See* Consumer Financial Protection Bureau, *Key Dimensions and Processes in the U.S. Credit Reporting System* 2-3 (2012), *at* http://files.consumerfinance.gov/ f/201212_cfpb_credit-reporting-white-paper.pdf (hereinafter "CFPB, *Key Dimensions*").

automated query to the company that had provided the disputed information, asking it to confirm its original report. Trans Union did not forward Brill's documentation to the company, ask about the company's identity verification procedures, or consider the documentation independently. The company confirmed the debt, and Trans Union refused to remove it. As a result, Brill struggled with the economic consequences of his tarnished credit report for over a year.

Brill sued Trans Union under the FCRA. The district court dismissed, holding as a matter of law that Trans Union had no legal duty to do more than it did to resolve the dispute. A2. But this Court has held that the question whether a reinvestigation is reasonable is one for the trier of fact, and under this Court's test for what constitutes a reasonable reinvestigation, a jury could easily find that what Trans Union did here did not comply with the FCRA.

This Court should reverse the dismissal of Brill's complaint.

## REQUEST FOR ORAL ARGUMENT

Appellant Jeffrey Brill respectfully requests oral argument in light of the importance of the issue presented to consumers' ability to obtain correction of inaccurate credit reports. Additionally, the district court's error in this case illustrates the need for this Court's careful guidance on the proper application of the FCRA's requirement that consumer reporting agencies reinvestigate disputed information. *See* 15 U.S.C. § 1681i(a)(1).

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arose under a law of the United States (the FCRA), and pursuant to 15 U.S.C. § 1681p (additional FCRA jurisdictional provision).

The district court's final judgment was entered by a magistrate judge. Both parties gave written consent to adjudication by the magistrate via local forms dated July 20, 2015 (for the defendant) and July 21, 2015 (for the plaintiff). Pursuant to the instructions on these forms, the parties submitted them by email. *See* Docs. 6-1, 9 (parties' jurisdictional memoranda to this Court). Therefore the magistrate had authority to enter a final judgment, *see* 28 U.S.C. § 636(c)(1) & (3), and that judgment was appealable to this Court under 28 U.S.C. § 1291.

The appeal was timely noticed on January 14, 2016, A30-31, within thirty days after the entry of judgment on December 16, 2015, *see* Fed. R. App. P. 4(a)(1)(A); A35 (docket entries for judgment and notice of appeal).

## ISSUE PRESENTED

The Fair Credit Reporting Act requires that a consumer reporting agency "conduct a reasonable reinvestigation" of disputed information in a consumer's file when the consumer notifies the agency of the dispute. Did the district court err in holding that, when a consumer disputes the factual basis of a debt reported in the consumer's file with a consumer reporting agency, the submission of an automated query to the supposed creditor complies with the statute as a matter of law?

## STATEMENT OF THE CASE

This case arises from consumer reporting agency Trans Union's failure to reinvestigate a debt it reported on plaintiff Jeffrey Brill's credit report after Brill disputed the debt because his signature on the relevant document had been forged. On this appeal from a dismissal for failure to state a claim, the following account reflects the facts as alleged, viewed in the light most favorable to the plaintiff. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010).

In May 2009, Brill leased a car jointly with his then-girlfriend Kelly Pfeifer from Smart Motors Toyota in Madison, Wisconsin. A3; A21. The lease was immediately assigned to Toyota Motor Credit Corporation ("Toyota"). *Id.* Brill and Pfeifer subsequently lost contact with each other, and Pfeifer kept the car. A3; A22. Brill did not sign any documents to extend the lease. *Id.* Nonetheless, after the original lease term ended in May 2012, Trans Union reported that Brill had an account with Toyota and was delinquent in making payments on that account. A3-4; A24; A28.

Toyota refused to provide Brill with a copy of any documents purporting to extend the lease in May 2012. A22. Brill obtained a copy of a later lease extension document from May 2013 with a signature purporting to be his, but the signature is a forgery. A3; A22-A23. Brill believes that Pfeifer, who also appears to have

4

signed the document in her own name, forged Brill's signature as a joint lessee. A22-23.

Brill alerted both Toyota and Trans Union to the forgery when he learned of it in 2014. A3; A23-A24. In conjunction with his dispute, Brill provided Trans Union with a sample of his true signature on the original 2009 lease agreement for comparison with the 2013 lease document and pointed out that — unlike the phony signature on latter document — he always signs his name using his middle initial. A3; A6 n.5; A25. Brill also directed Trans Union's attention to four other respects in which the real 2009 and fake 2013 signatures clearly differed. A25. Brill suggested to Trans Union that the employees or agents of Toyota who dealt with Pfeifer on the lease extension might have helpful information about the disputed lease document. A26.

Consumer reporting agencies commonly communicate with creditors electronically via automated consumer dispute verifications (ACDVs). CFPB, *Key Dimensions*, *supra* note 1, at 32. One court has described the process in this way:

> An ACDV is a form used by consumer reporting agencies to verify the accuracy of a disputed account. Once a consumer disputes an entry in her credit report, consumer reporting agencies forward an ACDV describing the dispute to the original source. The original source verifies the disputed information by checking a box on the ACDV form indicating the adverse account is accurate.

*Dixon-Rollins v. Experian Info. Solutions, Inc.*, 2010 WL 3749454, at *1 n.2 (E.D. Pa. Sept. 23, 2010).

Here, Trans Union's investigation consisted solely of sending an ACDV to Toyota to verify the debt and accepting its response without question. A4 & n.2; A26. Trans Union therefore continued to report that Brill owed a debt to Toyota. A4; A24.

The inaccurate blemish on Brill's credit report hindered his ability to obtain credit. As a result, Brill received less favorable interest rates and made larger down payments than he otherwise would have, spent additional time and resources to obtain credit, and had a business credit account closed. A27. These struggles and Brill's state of uncertainty as to his ability to obtain credit in the future caused him to suffer substantial stress and humiliation. A27-28.

In May 2015, Brill sued Trans Union for violating the FCRA by failing to conduct a reasonable reinvestigation of the disputed information. A13.[2] After Trans Union moved to dismiss for failure to state a claim, Brill filed an amended complaint, which is the operative complaint here. A20.

Trans Union filed another motion to dismiss for failure to state a claim, which the district court granted. A2. The court recited the framework for FCRA reinvestigation claims that this Court prescribed in *Henson v. CSC Credit Services*,

---

[2] Brill also sued Toyota in February 2015. That case reached a confidential settlement in May 2015. *See* Docket, *Brill v. Toyota Motor Credit Corp.*, No. 3:15cv00068 (W.D. Wisc.).

6

29 F.3d 280 (7th Cir. 1994). A5. Under *Henson*, a consumer reporting agency's duty to go beyond the original source of disputed information in reinvestigating a dispute turns on whether the consumer has "alerted the reporting agency to the possibility that the source may be unreliable" (or the reporting agency knows of the unreliability), and whether the cost to the consumer reporting agency of verifying the disputed information outweighs the "the possible harm inaccurately reported information may cause the consumer." 29 F.3d at 287.

Instead of applying that framework — or permitting a jury to do so — the court concluded that Brill's claim failed as a matter of law because, in the district court's view, the dispute was not one that could have been resolved through reasonable reinvestigation. A8. The court reached this conclusion because "even if Trans Union were to have performed its own handwriting analysis and decided that *it* believed Brill's explanation, Trans Union had no authority to cancel [Toyota]'s lease or otherwise to relieve Brill of his obligation to [Toyota]. That was the prerogative of [Toyota] or a court." A9. Brill cited several cases in which courts required consumer reporting agencies to conduct a reinvestigation that included more than confirming information with the creditor, A10-11, but the court distinguished these cases on the ground that, according to the court, the consumer reporting agency in each case on which Brill relied "had the means to correct the inaccuracies at issue by providing more complete information to the creditor."

7

A11. Here, by contrast, "Trans Union did not have a duty to reinvestigate because it did not have the authority to determine whether the credit agreement was valid or the signature was a forgery." *Id.*

The court also believed, based on a non-precedential order of this Court, *see* 7th Cir. R. 32.1, that expert handwriting analysis was categorically too expensive to be required as part of a reinvestigation. A8. The court did not consider methods of reinvestigation other than expert analysis, even though Brill had pointed out that Trans Union itself "easily could have discovered the forgery by comparing the 2013 lease extension with his handwriting samples," A8, and Brill's complaint mentioned the possibility that Toyota employees involved in executing the lease extension might have been able to help resolve the dispute, A26.

## SUMMARY OF ARGUMENT

The Fair Credit Reporting Act (FCRA) requires that a consumer reporting agency "conduct a reasonable reinvestigation" when a consumer disputes an item on his or her credit report. 15 U.S.C. § 1681i(a)(1)(A). The importance of a meaningful reinvestigation is underscored by the FCRA's structure and purpose: Congress meant for consumer reporting agencies to sort out inaccuracies so that consumers like Brill would not have their credit undermined by inaccurate reports. Accordingly, this Court has explained that where a consumer's dispute calls into question the reliability of information reported by a consumer reporting agency,

simply sending an automated dispute query to the creditor and relying on its response may not be sufficient to constitute a reasonable reinvestigation. Rather, it is up to a jury to balance the harm to the consumer of the erroneous report against the cost to the consumer reporting agency of further investigation in order to determine whether the reinvestigation was reasonable. Applying these standards, this Court and other courts of appeals have upheld determinations that a pro forma automated query to the alleged creditor is insufficient to constitute a reasonable reinvestigation and reversed decisions holding the contrary as a matter of law.

Here, a jury could easily find that Trans Union did not conduct a reasonable reinvestigation in this case and therefore violated the FCRA. As a threshold matter, in disputing the debt with Trans Union, Brill called the reliability of Toyota's information into question by providing specific information regarding his signature and its characteristics. Next, if the erroneous report regarding a debt that Brill did not owe was not corrected, the harms that Brill faced were obvious: less favorable terms of credit, outright denials of credit, anxiety and stress, and the financial losses associated with these outcomes. Indeed, he suffered each of these harms.

On the other side of the balance, the district court overstated the cost to Trans Union of verifying the debt. The district court assumed that reinvestigation required hiring a handwriting expert and that such a step was necessarily too costly. Both conclusions are erroneous and result from the district court's

improperly resolving factual questions on a motion to dismiss. This Court has not categorically ruled out handwriting analysis as a method of reinvestigation. In any event, Trans Union's reinvestigation could have proceeded by any of several methods. Brill has a strong case to make to a jury that his real signature on the 2009 lease and the phony signature on the 2013 extension are so dissimilar on their face that Trans Union could have resolved the dispute without incurring any cost at all: All it needed to do was look at the documents. But the district court's ruling as a matter of law denied Brill the opportunity to make that case. Other possible avenues for reinvestigation included speaking to the alleged creditor or its employees about who actually signed the lease papers and ascertaining whether the alleged creditor's procedures for identity verification were sufficient to screen out forgeries of the type that occurred here. The course that was not open to Trans Union was to ask Toyota to rubber-stamp its initial report and call that a "reinvestigation."

In dismissing the case, the district court mistakenly characterized Brill's dispute as a legal rather than factual one. In fact, Brill asked Trans Union to correct a mistake based on the answer to a simple factual question: Did Brill sign the lease renewal or was his signature forged? If correcting errors arising from obvious forgeries is beyond the reach of the dispute process, then the rights provided by the FCRA would mean very little and the consumer reporting agency's role would be

reduced to that of a scribe — in contravention of the FCRA's purpose to ensure that "consumer reporting agencies exercise their grave responsibilities with fairness [and] impartiality." 15 U.S.C. § 1681(a)(4). To protect consumers and give meaning to the congressional command that consumer reporting agencies "conduct a reasonable reinvestigation" of information in credit reports disputed by consumers, this Court should reverse the dismissal of Brill's complaint.

## STANDARD OF REVIEW

A dismissal for failure to state a claim is reviewed de novo, with the plaintiff's factual allegations presumed to be true. *Bonte*, 624 F.3d at 463. A court must deny a motion to dismiss if the complaint alleges sufficient facts to state a claim to relief that is plausible on its face. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). The court may not disregard non-conclusory factual allegations just because it views them as unlikely. *Id.* at 827.

## ARGUMENT

## I.   UNDER THE FCRA, PRIMARY RESPONSIBILITY FOR THE ACCURACY OF CREDIT REPORTS LIES WITH CONSUMER REPORTING AGENCIES.

The consumer reporting system "enables creditors and other providers of consumer services to pool information about their respective customers and use that pooled information to inform their credit and other risk decisions about new applicants and existing customers." CFPB, *Key Dimensions*, *supra* note 1, at 7.

This system includes credit files on over 200 million adults and provides information on more than 1 billion consumer credit accounts monthly. *Id.* at 3. At the "hub" of that system are the three major consumer reporting agencies: Equifax, Experian, and Trans Union. *Id.* at 2.

The information that consumer reporting agencies provide through credit reports is essential to most Americans' economic lives. *See id.* Most decisions whether to grant a person credit, such as through a mortgage, auto loan, student loan, or credit card, are based on information from credit reports. *Id.* Credit reports also affect other critical decisions that affect consumers, including eligibility for rental housing, insurance, and employment. *Id.*

Because of the many consequential uses of a consumer's credit report, the effects of erroneous information in that report can significantly impair a person's ability to engage in basic transactions that can determine her ability to succeed economically. Accordingly, when a consumer discovers an inaccuracy in her credit file, correcting it is crucial.

The FCRA reflects Congress's recognition of the importance to consumers of accurate credit reporting. Specifically, Congress found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers," and that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with

12

fairness, impartiality, and a respect for the consumer's right to privacy," 15 U.S.C. § 1681(a)(3)-(4). Therefore, Congress enacted the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *Id.* § 1681(b); *see also Pinner v. Schmidt*, 805 F.2d 1258, 1261 (5th Cir. 1986) ("The legislative history of the FCRA indicates that its purpose is to protect an individual from inaccurate or arbitrary information about himself in a consumer report that is being used as a factor in determining the individual's eligibility for credit, insurance, or employment.").

Under the FCRA, consumer reporting agencies must "conduct a reasonable reinvestigation" regarding disputed information. Specifically,

> if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . .

15 U.S.C. § 1681i(a)(1)(A). Additionally, in conducting the reinvestigation, "the consumer reporting agency shall review and consider all relevant information

submitted by the consumer . . . with respect to such disputed information." *Id.* § 1681i(a)(4).

After reinvestigation, "if . . . an item of the information [disputed by a consumer] is found to be inaccurate or incomplete or cannot be verified," the consumer reporting agency has a statutory obligation to "promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation." *Id.* § 1681i(a)(5)(A). Thus, once the reinvestigation requirement has been triggered, the default rule is that the disputed information must be deleted or modified unless it can be verified — that is, the statute requires the consumer reporting agency to give the benefit of the doubt to the consumer. Consumers may enforce these statutory requirements via civil actions. *See id.* §§ 1681n, 1681o, 1681p.

Other provisions of the FCRA underscore the central role of the consumer reporting agency in ensuring that the credit reporting system is fair to consumers. For instance, a consumer reporting agency must not only investigate disputes but also use appropriate procedures in assembling credit reports to begin with. In "prepar[ing] a consumer report," a consumer reporting agency must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Id.* § 1681e(b). This

duty, like the reinvestigation duty at issue in this case, is privately enforceable. *See id.* §§ 1681n, 1681o, 1681p.

Thus, the consumer reporting agency is at the heart of both the congressional purpose behind the FCRA and the enforceable rights Congress provided to consumers under that statute. *See generally Cushman v. Trans Union Corp.*, 115 F.3d 220, 223 (3d Cir. 1997) ("In the FCRA, Congress has recognized the crucial role that consumer reporting agencies play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole." (citation and internal quotation marks omitted)). And one of the most critical duties of a consumer reporting agency is to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A).

## II. WHEN A CONSUMER DISPUTES THE RELIABILITY OF THE SOURCE OF CREDIT INFORMATION, A REASONABLE REINVESTIGATION OFTEN REQUIRES MORE THAN PARROTING THE ORIGINAL SOURCE.

As noted, consumer reporting agencies often investigate disputes by sending an automated query (the ACDV) to the source of the information in dispute. However, as this Court explained in *Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994), a "reasonable reinvestigation" may require more than reconfirming disputed information with the original source of that information. "Whether the credit reporting agency has a duty to go beyond the original source will depend, in

part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable. The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Id.* at 287. Whether a reinvestigation is reasonable is a question of fact to be determined at trial. *Id.*

*Henson* reversed the dismissal of an FCRA claim by a person erroneously identified as a judgment debtor. A state court had mistakenly noted a judgment on its docket when no such judgment had been rendered, and Trans Union had reported the debt based on the docket. *Id.* at 285. This Court remanded the FCRA case for a determination whether the error had been brought to Trans Union's attention; if it had, the Court instructed that the trier of fact should determine whether Trans Union's reinvestigation was reasonable. *Id.* at 287.

The result in *Henson* illustrates that the "possibility that the source may be unreliable" can refer to unreliability with respect to the particular item disputed, even where the source is generally considered reliable. *Id.*; *accord Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997). In *Henson*, the disputed report derived from a state court docket. *Henson* did not suggest that state court dockets are unreliable in general. In fact, the Court, in a portion of its opinion addressing the consumer reporting agency's separate duty to ensure maximum

possible accuracy of credit reports as an initial matter under 15 U.S.C. § 1681e(b), noted that relying on the docket to begin with was reasonable. 29 F.3d at 286. In reversing the dismissal of the reinvestigation claim, *Henson* explained that even if a consumer reporting agency's reliance on a creditor may be reasonable as an initial matter, "[a] credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice," because with notice the agency "can target its resources in a more efficient manner and conduct a more thorough investigation." *Id.* at 286-87.

Henson also made clear that the "reinvestigation" requirement in some circumstances demands that a consumer reporting agency "verify the accuracy of its initial source of information" by "go[ing] beyond the original source." *Id.* Other courts of appeals agree. *See Cushman*, 115 F.3d at 225 ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources." (quoting 15 U.S.C. § 1681(a)(4)); *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) ("In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."); *cf. Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir. 1982) ("[W]e hold that a consumer reporting agency does not necessarily comply with [the duty to

follow reasonable procedures to assure maximum possible accuracy in credit reporting, 15 U.S.C. § 1681e(b)] by simply reporting in an accurate manner the information it receives from creditors."). Trans Union's persistent failures in this regard have caused one court to label Trans Union a "repeat FCRA offender" in holding that an award of punitive damages against it for failure to reinvestigate was warranted. *Dixon-Rollins v. Experian Info. Sols. et al.*, 2010 WL 3749454, at \*10 (E.D. Pa. Sept. 23, 2010) ("Trans Union's refusal to modify its reinvestigation procedures and insistence on mimicking the original sources' responses supports the conclusion that punitive damages are necessary to deter future violations.").

Reinvestigations of fraud, in particular, are unlikely to be reasonable if they involve only the original source of disputed information. For instance, in *Cushman v. Trans Union*, after someone fraudulently obtained three credit cards in Jennifer Cushman's name and ran up $2400 in balances, Cushman alerted Trans Union about the fraud. 115 F.3d at 222. Cushman provided less information than Brill gave Trans Union in this case: All she did was "notif[y] [Trans Union] that she had not applied for or used the three credit cards in question, and suggested that a third party had fraudulently applied for and obtained the cards." *Id.* Trans Union's reinvestigation consisted of confirming the debts with the credit card companies and asking if Cushman had opened a fraud investigation (she hadn't). *Id.* Trans Union was unable to contact one of the credit card companies, so Trans Union

deleted that account from Cushman's report. *Id.* The other two companies reported that Cushman's "verifying information" (such as name, address, and social security number) was correct, so Trans Union refused to delete those accounts from the credit report. *Id.*

Relying on *Henson* among other authorities, the Third Circuit rejected Trans Union's argument that "it is never required to go beyond the original source in ascertaining whether the information is accurate." *Id.* at 224. The court observed that such a reading of the duty to reinvestigate would render the reinvestigation requirement of § 1681i duplicative of the initial investigation requirement of § 1681e(b). *Id.* at 225. Instead, the Third Circuit adopted this Court's balancing approach from *Henson*. *Id.* at 225-26. Applying that framework, the court held that the district court had erred in granting judgment for Trans Union because a "reasonable jury . . . could have concluded that after [Trans Union] was alerted to the accusation that the accounts were obtained fraudulently, and then confronted with the credit grantors' reiteration of the inaccurate information, [Trans Union] should have known that the credit grantors were 'unreliable' to the extent that they had not been informed of the fraud." *Id.* at 226.

Similarly, *Stevenson v. TRW Inc.* involved a credit report reflecting debts that did not belong to the plaintiff — some belonged to a person with the same name as the plaintiff and others had been incurred fraudulently by the plaintiff's

estranged son using the plaintiff's social security number. 987 F.2d at 290-91. The consumer reporting agency's reinvestigation consisted of sending the creditors automated inquiries about the disputed accounts; the responses prompted the consumer reporting agency to remove some but not all of the disputed information. *Id.* at 291, 293. Noting that § 1681i uses mandatory language and "places the burden of investigation squarely on" the consumer reporting agency, the Fifth Circuit upheld the district court's finding that TRW had violated § 1681i and rejected the credit bureau's argument that its only obligation was to publish the consumer's statement of his position at the end of the credit report and that the consumer was otherwise left to resolve the dispute with the creditor on his own. *Id.* at 293.

*Johnson v. MBNA America Bank, NA*, 357 F.3d 426 (4th Cir. 2004), another case in which the wrong person had been identified as responsible for an account, considered the reinvestigation duty of a furnisher of credit information, which the court found analogous to the duty of the consumer reporting agency. MBNA had issued a credit card to Linda Johnson's husband. After he filed for bankruptcy, MBNA claimed that Johnson was a co-obligor on the account even though she was only an authorized user. *Id.* at 428-29. Because MBNA subsequently confirmed the debt after several consumer reporting agencies reported Johnson's dispute to MBNA, *see id.* at 429, Johnson sued MBNA for violating its duty, as a furnisher of

credit information, to investigate, *see* 15 U.S.C. § 1681s-2(b). Citing this Court's decision in *Henson* and finding that the furnisher's and consumer reporting agency's duties to investigate required the same analysis, *see* 357 F.3d at 432-33, the Fourth Circuit affirmed a jury verdict in favor of Johnson, *id.* at 429-33. Based on the plain meaning of the word "investigation" — "'[a] detailed inquiry or systematic examination,'" *id.* at 430 (quoting American Heritage Dictionary 920 (4th ed. 2000)) — the court held that the FCRA imposes more than a "minimal duty on creditors to briefly review their records to determine whether the disputed information is correct"; rather, "careful inquiry" is required. *Id.* Moreover, "[i]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute — and, ultimately, correct — inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, *un*reasonable inquiries." *Id.* at 430-31. The court held that the evidence supported the jury's verdict because MBNA did no more than confirm its computer system's records of Johnson's name, address and account status despite being notified of the specific nature of Johnson's dispute. *Id.* at 431.

Finally, *Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986), involved a consumer reporting agency's duty to reinvestigate after a consumer alleged that his credit account with his employer had been loaded with fictitious charges by a co-worker with a grudge against him. *Id.* at 1260-61. The Fifth Circuit upheld the

jury's verdict for the consumer on a § 1681i claim because the consumer reporting agency, despite learning of the dispute between the consumer and his co-worker, contacted only the co-worker. *Id.* at 1262.

The lesson from these cases (two of which explicitly applied this Court's approach in *Henson*) is that when a consumer alleges that charges are fraudulent or do not belong to her, a proper "reinvestigation" often means more than just rechecking the same information received from the original source, and the reasonableness of the reinvestigation is a question for the jury, not a question resolvable as a matter of law on a motion to dismiss. Because Trans Union here did no more "reinvestigating" than the consumer reporting agencies in *Cushman*, *Stevenson*, *Johnson*, and *Pinner*, Brill's claim should not have been dismissed as a matter of law.

## III.   A   JURY   COULD   FIND   THAT   TRANS   UNION'S REINVESTIGATION WAS NOT REASONABLE.

### A. Brill's Dispute Called Toyota's Reliability Into Question, The Risk Of Harm To Brill Was Clear, And The Cost Of Reinvestigation Was Low.

Under *Henson*, a jury could easily find that Trans Union's sending an automated query to Toyota was not a "reasonable reinvestigation" of Brill's dispute. As a threshold matter, Brill's dispute "alerted the reporting agency to the possibility that the source may be unreliable." *Henson*, 29 F.3d at 287. Brill explained that Toyota's information was unreliable because Brill's signature on the

22

lease renewal with Toyota had been forged. Brill not only "alerted" Trans Union to the "possibility" that Toyota's information "may be unreliable," but also provided a handwriting exemplar and specific information about his signature (the use of the middle initial) that cast doubt on the signature on the lease renewal. Brill thus went above and beyond what *Henson* required him to do to call into question Toyota's reliability as a furnisher of information in this instance.

Under the *Henson* balancing test, "the possible harm inaccurately reported information may cause the consumer" far outweighed "the cost of verifying the accuracy of the source." *Id.* The possible harms to Brill of the inaccurate information were foreseeable: less favorable terms of credit, outright denials of credit, anxiety and stress, and the financial losses associated with these outcomes. Unsurprisingly, Brill suffered each of these harms. A27-28. Whereas the risk to Brill of erroneous information was high, the cost to Trans Union of verifying the report's accuracy was low. The district court focused on only one possible means of investigation — hiring a handwriting expert — and dismissed that option as both unreasonably costly and insufficiently reliable, A8; A9 n.5, even though Brill had pointed out that Trans Union could have discovered the forgery by examining the documents itself, A8, and suggested that Toyota employees involved in executing the lease extension might have been able to help resolve the dispute, A26.

The court's brief analysis on the cost to Trans Union is infused with erroneous assumptions or factual determinations inappropriate at the motion-to-dismiss stage. First, the district court's concern about the burdensomeness of expert handwriting analysis depended on a pre-2007 non-precedential opinion that may not be cited to this Court. A8 (relying on *Bagby v. Experian Info. Solutions, Inc.*, 162 Fed. App'x 600, 607 (7th Cir. 2006)); *see* 7th Cir. R. 32.1. That case is in any event distinguishable because the plaintiff there had not offered any evidence to show that the credit bureau's sources of information were unreliable. There is no per se rule against handwriting analysis; indeed, a categorical approach to methods of reinvestigation would be inconsistent with the flexible balancing test that this Court has prescribed. *Henson*, 29 F.3d at 287. Moreover, the balancing test is to be applied by the jury as the trier of fact. *See id.* The district court erred in making factual assumptions at the pleading stage about how costly or burdensome expert analysis would have been.

Second, the district court based its low opinion of the reliability of handwriting analysis on an evidentiary ruling in a criminal case suggesting (according to the district court) that "the entire field of handwriting analysis rests on a shaky foundation that relies on inadequately tested principles." A9 n.5. Whether or not that characterization is fair as a matter of evidence, the FCRA requires a "reasonable reinvestigation," not proof of a debt's invalidity beyond a

reasonable doubt. The district court cited no authority for the proposition that a consumer reporting agency's reinvestigation could rely only on evidence admissible in a criminal trial. Indeed, importing the rules of evidence into FCRA reinvestigations would make little sense, as so much of the information on which a consumer reporting agency relies is necessarily hearsay.

Last and most important, the district court erred in focusing exclusively on the hiring of a handwriting expert in considering the cost to Trans Union. Brill is not claiming that hiring a handwriting expert was the only available means of reinvestigation. The significance of the handwriting information Brill provided — including the distinctive middle initial that Brill always uses but that the signature on the Toyota document lacked — is not that it triggered a particular *method* of reinvestigation. Rather, it triggered a certain *depth* of reinvestigation, one that went beyond reliance on Toyota's response to the automated query. Hiring a handwriting expert was one option. Another was to call Toyota to determine which employee negotiated the extension of the car lease at issue and whether that person dealt with Pfeifer, Brill, or both. Trans Union also could have sought to ascertain whether Toyota's procedures for verifying identity were sufficient to avert the type of fraud Brill was claiming. Finally, and most inexpensively, Trans Union could have looked at the handwriting, recognized that in light of the obviously inconsistent signatures it could not verify that Brill owed the debt, and deleted that

information in accordance with the FCRA. 15 U.S.C. § 1681i(a)(5)(A); *accord Stevenson*, 987 F.2d at 293 (stressing that "§ 1681i(a) requires prompt deletion if the disputed information is inaccurate or *unverifiable*").

That last possibility — that a lay opinion could have resolved the dispute — made dismissal as a matter of law particularly inappropriate here, because the susceptibility of the dueling signatures to lay analysis is quintessentially a question of fact reserved for the jury in applying this Court's balancing test. *Henson*, 29 F.3d at 287. The district court noted Brill's suggestion that a direct comparison would have "easily" revealed the forgery, but the court nonetheless proceeded as if expert analysis were the only option. A8. In fact, had the case proceeded, Brill would have introduced the signatures on the 2009 lease and the 2013 forgery. The jury would then have been in a position to compare them and to judge whether the obvious discrepancies between the two would have enabled Trans Union to resolve the dispute in the least expensive manner possible: by looking at the documents.

The several reasonable avenues for reinvestigation show that a jury could have readily found that the cost to Trans Union of verifying Toyota's information was far outweighed, in the *Henson* balancing test, by the harm Brill could be expected to suffer (and in fact did suffer) as a result of the erroneous information Trans Union reported.

**B. The District Court Erred In Relying On Cases In Which Reinvestigation Could Not Have Resolved The Dispute.**

In reaching a result contrary to that dictated by *Henson*, the district court relied on two decisions from other courts of appeals holding that, in particular circumstances, consumer reporting agencies did not have duty to reinvestigate at all. *See* A9 (citing *Carvalho v. Equifax Information Services, LLC*, 629 F.3d 876 (9th Cir. 2010), and *DeAndrade v. Trans Union LLC*, 523 F.3d 61 (1st Cir. 2008)). As an initial matter, it is this Court's balancing framework in *Henson* that controls, not the decisions from other circuits. In any event, the two cases on which the district court relied do not support Trans Union's position.

In *DeAndrade*, a homeowner purchased new windows from a contractor who was also responsible for arranging mortgage financing for the purchase. 523 F.3d at 63. The homeowner signed financing papers in connection with this arrangement and then began receiving bills from KeyBank. *Id.* After nearly two years of making payments, the homeowner disavowed the arrangement, stopped paying the mortgage, and sued KeyBank claiming that the contractor lacked authority to set up the mortgage on the homeowner's behalf. *Id.* 63-64. KeyBank reported the mortgage as delinquent to Trans Union, which reported it as such. *Id.* at 64. The homeowner disputed the debt with Trans Union and, when Trans Union did not change the credit report, sued for failure to reinvestigate under the FCRA. *Id.*

27

The First Circuit affirmed judgment in favor of Trans Union on the ground that the homeowner did not raise a type of dispute that Trans Union had an obligation to reinvestigate. *Id.* at 68-69. The court explained that in "determin[ing] whether a consumer has identified a factual inaccuracy on his or her credit report that would activate § 1681i's reinvestigation requirement, '[t]he decisive inquiry' is whether the defendant credit bureau could have uncovered the inaccuracy 'if it had reasonably reinvestigated the matter.'" *Id.* at 68 (quoting *Cushman*, 115 F.3d at 226). That test was not satisfied in *DeAndrade*, the First Circuit held:

> [T]here is no dispute that DeAndrade received windows financed by a mortgage on his home; what DeAndrade is attacking is the mortgage's validity. Whether the mortgage is valid turns on questions that can only be resolved by a court of law, such as whether DeAndrade ratified the loan. This is not a factual inaccuracy that could have been uncovered by a reasonable reinvestigation, but rather a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA.

*Id.* at 68.

Here, unlike in *DeAndrade*, Trans Union *could* have uncovered the inaccuracy if it had reasonably reinvestigated the matter. The dispute about whether Brill signed the lease extension is quintessentially factual, not legal. The answer turns not on the definition of "ratification" or any other legal standard but on a straightforward historical question: Who signed the lease extension — Jeffrey Brill or somebody else? As courts of appeals have repeatedly held regarding similar disputes, this type of factual question can be resolved through

reinvestigation. *See supra* Part II (discussing *Cushman*, *Stevenson*, *Johnson*, and *Pinner*). Therefore the outcome dictated under this Court's *Henson* case and the persuasive decisions of the Third, Fourth, and Fifth Circuits is in accord with the First Circuit's approach.

The Ninth Circuit's decision in *Carvalho* does not counsel a different result. There, a patient disputed a debt to a medical provider based on the theory that the patient's insurance company had "wrongfully refused to pay" the bill, despite the undisputed fact that she agreed to be financially responsible for it. *Carvalho*, 629 F.3d at 882-83. The patient sued the three major consumer reporting agencies for failure to reinvestigate under the California analogue to the FCRA, and the Ninth Circuit affirmed judgment for the defendants. *Id.* at 889-92. The problem for the patient in *Carvalho*, as for the homeowner in *DeAndrade*, was that a consumer reporting agency "is not required as part of its reinvestigation duties to provide a legal opinion on the merits," *id.* at 892, of questions such as whether a third party had an obligation to pay the consumer's debt. Or, put in terms of the analysis in *DeAndrade*, the consumer reporting agencies could not have uncovered the inaccuracy through reinvestigation. Here, by contrast, Brill's report could have

been discovered through reinvestigation — a perusal of Brill's documentation would have sorted it out.[3]

The district court thought that *DeAndrade* and *Carvalho* were pertinent here because Trans Union had no power to negate Brill's alleged debt with Toyota. A9. That fact is beside the point. The plain language of the FCRA is unequivocal: "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation." 15 U.S.C. § 1681i(a)(1)(A). The statute makes no mention of the reinvestigation's effect on the validity of the underlying debt. Thus, the fact that a consumer reporting agency has no power to void debts has not prevented courts from holding consumer reporting agencies to their duty to reinvestigate. *See Cushman*, 115 F.3d at 225-26; *Stevenson*, 987 F.2d at 293. The FCRA's primary focus on the activities and responsibilities of consumer reporting agencies, *see supra* Part I, buttresses the conclusion that the consumer reporting

---

[3] The district court's adjacent citation to *Wantz v. Experian Information Solutions*, 386 F.3d 829 (7th Cir. 2004), is misplaced for a more basic reason. There, the FCRA claim failed because the plaintiff had not put forth any evidence that he had suffered damages and because the consumer reporting agency did not disclose incorrect information. *See id.* at 834-35. Neither of those circumstances is present here.

agency's duty to reinvestigate exists independent of the reinvestigation's effect on the underlying debt.

Additionally, the FCRA's requirement that a consumer reporting agency delete or modify even *unverifiable* information, not just information that is found to be inaccurate, *see* 15 U.S.C. § 1681i(a)(5)(A), shows that the consumer reporting agency's duty depends on whether it can *verify* the debt, not whether it can *modify* the debt. More broadly, this "tie-goes-to-consumer" rule underscores the extent of congressional concern about unwarranted blemishes on consumer credit reports — a concern that counsels against a cramped reading of consumers' rights under the FCRA.

Under the district court's opinion, any forgery or deception, no matter how obvious it might be upon review, would lie beyond the duty of the consumer reporting agency to reinvestigate. The First and Ninth Circuit opinions in *DeAndrade* and *Carvelho* do not require such a result. If they did, they should be rejected as conflicting with this Court's *Henson* balancing test, as well as with Congress's intent to ensure that consumer reporting agencies meet "the needs of commerce for consumer credit . . . information in a manner which is fair and equitable to the consumer." *Id.* § 1681(b).

## CONCLUSION

The dismissal of the complaint should be reversed.

31

Dated:  April 18, 2016                           Respectfully submitted,

                                                  /s/ Scott Michelman

Joel Winnig                                       Scott Michelman
ATTORNEY JOEL WINNIG                              Julie A. Murray
414 D'Onofrio Drive, Suite 120                    PUBLIC CITIZEN LITIGATION GROUP
Madison, WI 53719                                 1600 20th Street NW
(608) 829-2888                                    Washington, DC 20009
                                                  (202) 588-1000
                                                  smichelman@citizen.org

          *Counsel for Plaintiff-Appellant Jeffrey Brill*

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of 32(a)(7)(B) because this brief contains 7,359 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point type.

/s/ Scott Michelman

## CERTIFICATION REGARDING APPENDIX

I hereby certify that all of the materials required by parts (a) and (b) of Local Rule 30 are included in the attached appendix.

/s/ Scott Michelman

## CERTIFICATION OF SERVICE

I hereby certify that on April 18, 2016, I electronically filed this brief and attached appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Scott Michelman

**STATUTORY APPENDIX:**  Excerpts from the Fair Credit Reporting Act

**15 U.S.C. § 1681**:

**(a) Accuracy and fairness of credit reporting.**

The Congress makes the following findings:

**(1)** The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

**(2)** An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

**(3)** Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

**(4)** There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

**(b) Reasonable procedures.** It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

**15 U.S.C. § 1681e**:

**(b) Accuracy of report.** Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

**15 U.S.C. § 1681i**:

**(a) Reinvestigations of disputed information**

    **(1) Reinvestigation required.—**

        **(A) In general.—** Subject to subsection (f) of this section, if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

        **(B) Extension of period to reinvestigate.—** Except as provided in subparagraph (C), the 30-day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30-day period that is relevant to the reinvestigation.

        **(C) Limitations on extension of period to reinvestigate.—** Subparagraph (B) shall not apply to any reinvestigation in which, during the 30-day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

    **(2) Prompt notice of dispute to furnisher of information.—**

        **(A) In general.--**Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice

shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

**(B) Provision of other information.——** The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer or the reseller after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

**(3) Determination that dispute is frivolous or irrelevant.——**

**(A) In general.——** Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

**(B) Notice of determination.——** Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

**(C) Contents of notice.——** A notice under subparagraph (B) shall include—

**(i)** the reasons for the determination under subparagraph (A); and
**(ii)** identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

**(4) Consideration of consumer information.——** In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

**(5) Treatment of inaccurate or unverifiable information.—**

**(A) In general.—** If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall—

**(i)** promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and

**(ii)** promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

**(B) Requirements relating to reinsertion of previously deleted material.—**

**(i)** Certification of accuracy of information.— If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

**(ii)** Notice to consumer.— If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

**(iii)** Additional information.— As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—

**(I)** a statement that the disputed information has been reinserted;

**(II)** the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of

information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

**(III)** a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

**(C) Procedures to prevent reappearance.—** A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

**(D) Automated reinvestigation system.—** Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

# **APPENDIX**

## <u>TABLE OF CONTENTS</u>

Judgment (Dkt. 25-2, Jan. 15,2016)............................................................................................A 1

Opinion and Order (Dkt. 25-1, Jan. 15, 2016) ............................................................................A 2

Original Complaint (Dkt. 1, May 26, 2015) ...............................................................................A 13

Amended Complaint (Dkt. 12, August 2, 2015)..........................................................................A 20

Notice of Appeal (Dkt. 25, Jan. 15, 2016) ................................................................................A 30

Docket for Case No. 3:15-cv-00300-slc (W.D. Wis.) as of Jan. 15, 2016.................................A 32

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY BRILL,

      Plaintiff,                                   JUDGMENT IN A CIVIL CASE

   v.                                       Case No.   15-cv-300-slc

TRANS UNION LLC,

      Defendant.

    This action came before the court for consideration with Magistrate Judge Stephen L. Crocker presiding.  The issues have been considered and a decision has been rendered.

    IT IS ORDERED AND ADJUDGED that judgment is entered in favor of defendant Trans Union LLC against plaintiff Jeffrey Brill granting defendant's motion to dismiss and closing the case.

_____s/ K. Frederickson, Deputy Clerk_____      _____December 16, 2015_____
Peter Oppeneer, Clerk of Court                           Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY BRILL,

                Plaintiff,

      v.

TRANS UNION LLC,

                Defendant.

OPINION AND ORDER

15-cv-300-slc

In this civil lawsuit for monetary and injunctive relief, plaintiff Jeffrey Brill alleges that defendant Trans Union, LLC violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, when it continued to report that Brill had defaulted on an automobile lease account with Toyota Motor Credit Corporation (TMCC) after Brill reported to Trans Union that the underlying debt reported by TMCC was based on a lease extension on which Brill's signature had been forged. Before the court is Trans Union's motion to dismiss Brill's amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Dkt. 13.

As discussed below, I find that Trans Union did not have a legal duty to do more to resolve Brill's report that someone had forged Brill's signature on TMCC's lease extension. Therefore, I am granting the motion to dismiss.

I have drawn the following facts from Brill's amended complaint (dkt. 12) and I assume these facts to be true for the purpose of deciding Trans Union's motion to dismiss. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

ALLEGATIONS OF THE AMENDED COMPLAINT

Plaintiff Jeffrey Brill is an adult resident of Colorado. Defendant Trans Union LLC is a limited liability company whose principal office is located in Chicago, Illinois.

On or about May 4, 2009, Brill and Kelly Pfeifer jointly leased a vehicle from the Smart Motors Toyota dealership in Madison, Wisconsin.  Smart Motors immediately assigned this lease to Toyota Motor Credit Corporation (TMCC).  The original lease term was 36 months, so the lease was scheduled to terminate on May 3, 2012.  At some point before May 3, 2012, Brill lost contact with Pfeifer, who kept possession of the car.  Unbeknownst to Brill, Pfeifer kept the vehicle after the original lease term expired on May 3, 2012.  Brill did not sign any documents extending his lease obligations, but Trans Union continued to report Brill's credit relationship with TMCC after the expiration of the original lease term.  Apparently, and unbeknownst to Brill, Pfeifer had extended the lease with Toyota in both her name *and* Brill's name for another year.[1]

Trying to figure out what had happened, Brill obtained from TMCC a copy of a lease extension dated May 2, 2013.  This lease extension has a signature on it that purports to be Brill's signature.  The signature is a forgery.  Brill informed both TMCC and Trans Union of the forged signature.  On May 20, 2014, Brill disputed the accuracy of his credit report with Trans Union.  Brill informed Trans Union that his purported signature on the lease extension lacked his middle initial.  Brill told Trans Union that he always signed his name using the middle initial "D," even in places where his name was not typed with the middle initial.  Brill also provided Trans Union with "at least four points of handwriting analysis of his signature."  Dkt. 12 at ¶ 46.

---

[1]  Brill alleges that, despite his direct requests to TMCC, TMCC has not provided him with any documents that explain the relationship between TMCC and Pfeifer after the original lease expired, and TMCC has not explained its contention that Brill continued to be responsible on the extended lease.

2

Notwithstanding Brill's information, TMCC continued to contend that Brill is responsible on the lease, and Trans Union continued to report that Brill had a 36-month account with TMCC that was in default almost five years after the account was opened. According to Brill, Trans Union did nothing more than ask Toyota to respond to an automated consumer dispute verification (CDV). Brill contends that this constitutes an inadequate means of investigating an identity theft.[2] In addition, Trans Union falsely reported that Toyota charged off $8,795 as Brill's bad debt and "resolved the customer dispute." *Id.* at ¶¶ 68-69.

OPINION

## I. Legal Standard

A Rule 12(b)(6) motion "challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). In deciding a motion under Rule 12(b)(6), the court views the complaint in the light most favorable to the non-movant, accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the non-movant's favor. *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014).

A claim survives a Rule 12(b)(6) challenge when it "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[2] Brill states in his response brief that he is assuming for purposes of the motion to dismiss that Trans Union initiated an automated CDV even though there is no evidence in the current record that Trans Union actually did this. Dkt. 19 at n.1.

inference that the defendant is liable for the misconduct alleged." *Id.* This means that "the complaint must contain 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013).

## II. Discussion

The Fair Credit Reporting Act (FCRA) requires credit reporting agencies to conduct a "reasonable reinvestigation" of information in a credit report when a consumer disputes the accuracy of that information. 15 U.S.C. § 1681i(a)(1)(A). The Act does not define what constitutes a reasonable reinvestigation. *Jianqing Wu v. Trans Union*, 2006 WL 4729755, at *8 (D. Md. May 2, 2006). However, the Court of Appeals for the Seventh Circuit has explained that "a credit reporting agency may be required, in certain circumstances, to verify the source of its initial information." *Henson v. CSC Credit Services*, 29 F.3d 280, 287 (7th Cir. 1994). Whether the credit reporting agency has such a duty depends on two factors: (1) "whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable;" and (2) "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Id. See also Bagby v. Experian Info. Solutions, Inc.*, 162 F. App'x 600, 606 (7th Cir. 2006) (applying same standard).

Brill contends that Trans Union inaccurately reported that he had a delinquent debt with TMCC. Although Brill acknowledges that he was a co-owner on the account between 2009 and 2012, it was *after* this that lease term was extended for one year in 2013 and the car was not returned after the lease term expired. Brill alleges his purported signature on the lease extension

is a forgery, that he did not agree to extend the term, and that he did not even know that the term had been extended.  According to Brill, Trans Union is at fault here because even after he notified Trans Union that he was the victim of identity theft and provided Trans Union with a handwriting analysis,[3] Trans Union did not conduct a proper reinvestigation and failed to correct the inaccurate information.  According to Brill, his report to Trans Union alerted Trans Union to the likelihood that a reasonable reinvestigation as required by law would require more than an automated consumer dispute verification and the information that Trans Union had received from Toyota was not reliable.  In fact, asserts Brill, the information and documents that he provided to Trans Union proved that he had no debt to Toyota.  *See* amended complaint, dkt. 12, at ¶¶ 38-41.

Trans Union responds that, notwithstanding Brill's assertions, Brill is not entitled to relief as a matter of law because the factual inaccuracy that Brill alleges cannot be resolved through a reasonable investigation by a credit reporting agency.  As Trans Union notes, federal courts consistently hold that the FCRA does not impose a duty on credit reporting agencies to verify the validity of the underlying debt when conducting reinvestigations.  *See, e.g., Carvalho v. Equifax Information Services, LLC*, 629 F.3d 876, 890-91 (9th Cir. 2010) (duty to reinvestigate not triggered where plaintiff claimed she not legally obligated to pay her medical bills until her insurer had been billed; "reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts"); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (allegedly forged mortgage underlying plaintiff's debt "not a factual inaccuracy

---

[3] Brill's amended complaint does not describe the exact contents of the documents that he provided to Trans Union but it appears that he provided the agency with samples of his true signature to compare to the lease document.

that could have been uncovered by a reasonable reinvestigation, but rather a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA."); *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 607 (7th Cir. 2006) (although plaintiff alleged delinquent accounts were opened by her mother without her consent, agency had no duty to investigate beyond CDV inquiry).

In such cases, courts have found that the proper target of the plaintiff's claim is the creditor, which is in a much better position to determine the authenticity of its own records.  *See Carvalho*, 629 F.3d at 892 ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts")[4]; *Williams v. Colonial Bank*, 826 F. Supp. 415, 418 (M.D. Ala. 1993) *aff'd*, 29 F.3d 641 (11th Cir. 1994) ("A credit reporting agency has no duty, as a part of its reinvestigation, to go behind public records to check for accuracy or completeness when a consumer is essentially collaterally attacking the underlying credit information."); *cf. Saunders v. Branch Banking and Trust Co. Of Virginia*, 526 F.3d 142, 150 (4th Cir. 2008) (in lawsuit against a "furnisher," court notes in dicta that claims against CRAs based on a legal dispute of an underlying debt raise concerns about collateral attacks because the creditor is not a party to the suit).

At least two federal appellate courts have noted that the "decisive inquiry" in determining whether a duty to reinvestigate arises under § 1681i is whether the credit reporting agency

---

[4]  The court in *Carvalho* cites to its own precedent in which it notes that "the 'reasonable' qualifier attached to a CRA's duty to reinvestigate limits its obligations on account of its third-party status and the fact that it is repeating a task already completed once."  *Gorman v. Wolpoff* & *Abramson, LLP* 584 F.3d 1147, 1157 (9th Cir. 2009).  "Indeed, as the statute recognizes, the furnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation.  With respect to the accuracy of disputed information the CRA is a third party, lacking any direct relationship with the consumer . . . ."  *Id.* at 1156.

"could have" uncovered the inaccuracy if it had "reasonably reinvestigated the matter." *DeAndrade*, 523 F.3d at 68; *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997). *See also Cornock v. Trans Union LLC*, 638 F. Supp. 2d 158, 165 (D.N.H. 2009) ("The nature of the inquiry, then, is predictive, not retrospective; it asks what could have happened if the defendant had conducted a reasonable reinvestigation, not what did happen as a result of whatever reinvestigation the defendant actually performed.").

Although Brill concedes that "credit agencies may not be required to analyze hand writing in every case of a claimed forgery," he contends that *his* case is different because of the "specific information" that Brill provided to Trans Union that triggered a statutory duty "to take reasonable steps to determine the issue of forgery or identity theft to which Brill had alerted Trans Union." Amended Complaint, dkt. 12, at ¶ 47.

Brill suggests in his brief that Trans Union easily could have discovered the forgery by comparing the 2013 lease extension with his handwriting samples. First, as the parties discuss, the Seventh Circuit has noted in dicta that requiring a credit reporting agency to hire a handwriting expert to verify the accuracy of accounts would be "quite costly and unnecessary." *Bagby*, 162 Fed. App'x at 607.

Second, and more importantly at the rule 12(b)(6) dismissal stage, whether Brill's signature on the 2013 lease extension is a forgery is a legal question that Trans Union could not resolve through reinvestigation. As the Court of Appeals for the Ninth Circuit observed in *Carvalho*,

> The fundamental flaw in Carvalho's conception of the reinvestigation duty is that credit reporting agencies are not tribunals. They simply collect and report information furnished by others. Because CRAs are ill equipped to adjudicate contract

7

> disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims.

629 F.3d at 891.[5]

In this case, even if Trans Union were to have performed its own handwriting analysis and decided that *it* believed Brill's explanation, Trans Union had no authority to cancel TMCC's lease or otherwise to relieve Brill of his obligation to TMCC.  That was the prerogative of TMCC or a court.  *Carvalho* 629 F.3d at 892 (determining whether consumer has valid defense to debt claim is question for court to resolve); *DeAndrade*, 523 F.3d at 68 (determining the validity of mortgage now challenged by consumer in his FCRA lawsuit against the CRA "turns on questions that can only be resolved by a court of law" and is "a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA.").  Therefore, unless and until a proper tribunal concluded that Brill's signature was a forgery, Trans Union was accurately reporting that the TMCC debt was Brill's.  *See DeAndrade*, 523 F.3d at 67 ("[W]ithout a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail."); *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004) (without evidence that the defendant "disclosed incorrect information," the plaintiff cannot prove a violation of the FCRA's reinvestigation requirement).

---

[5]  It is worth noting is that, notwithstanding Brill's unflagging insistence that even lay people can accurately identify forged signatures, courts remain skeptical whether even trained experts can draw reliable conclusions from handwriting comparisons. *See, e.g., U.S. v. Johnsted*, 12-cr-146-wmc (W.D. Wis.) in which the court granted defendant's *Daubert* motion to strike the testimony of the government's handwriting experts, noting that the entire field of handwriting analysis rests on a shaky foundation that relies on inadequately tested principles.  Oct. 8, 2013 order, dkt. 41.  In the instant order addressing a 12(b)(6) motion, this court cannot and will not rely on or find facts outside the allegations in Brill's amended complaint.  The point is that, as a legal matter, just because Brill characterizes handwriting examination as a "reasonable" step for a CRA to take during reinvestigation doesn't make it so.

8

Brill cites a few cases involving identity theft to support his argument that Trans Union had a duty to look beyond TMCC's responses to a simple CDV form confirming that Brill had an outstanding debt. *Cushman*, 115 F.3d at 226; *Stevenson v. TRW Inc.*, 987 F.2d 288, 291 (5th Cir. 1993); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1232 (D.N.M. 2006). However, these cases are distinguishable from Brill's situation.

The court in *Cushman* determined that the CDVs sent by the credit reporting agency did not constitute a "reasonable" reinvestigation because the creditors had no way of knowing from the brief information on the forms that the plaintiffs may have been victims of identity theft. *Cushman*, 115 F.3d at 226 ("[A]fter [credit reporting agency] alerted to the accusation that the accounts were obtained fraudulently, and then confronted with the credit grantors' reiteration of the inaccurate information, [the agency] should have known that the credit grantors were 'unreliable' to the extent that they had not been informed of the fraud."). In this case, however, Brill specifically alleges that he told TMCC as well as Trans Union that the signature on the 2013 lease extension was forged, and Brill fails to allege any other facts from which the court could infer that TMCC was an unreliable source.

In *Stevenson*, 987 F.2d at 293, the issue was whether TRW "promptly deleted" plaintiff's credit information after learning from returned CDVs that the information was unverifiable and inaccurate. Here, TMCC never reported that the debt was inaccurate, even after Brill directly supplied TMCC with what he considered to be evidence of the forgery. Finally, in *Apodaca*, the credit reporting agency's computer mistakenly identified two consumers as the same person, resulting in the CRA mingling their credit information. 417 F. Supp. 2d at 1224. The court determined that if the credit reporting agency had forwarded copies of all the information

9

supplied by the plaintiff to a competent investigator instead of simply reducing that information to a three-digit code on its standardized CDV form, it could have corrected the situation more promptly without significant additional costs.  *Id.* at 1232.

In each of these cases, the credit reporting agency had the means to correct the inaccuracies at issue by providing more complete information to the creditor or by acting more quickly.  In Brill's case, Trans Union did not have a duty to reinvestigate because it did not have the authority to determine whether the credit agreement was valid or the signature was a forgery.  Accordingly, Brill can not state a claim against Trans Union for failing to conduct a reasonable reinvestigation under § 1681i.

All of this being so, Brill's amended complaint paints a woeful picture of a man who can't buy a break.  He's in a personal relationship with Pfeifer that seems strong enough to bear the weight of a joint car lease.  But things don't work out and they split up; even so, Brill lets Pfeifer keep the car.  What's his reward?  According to Brill, Pfeifer forges his signature on the lease renewal, then takes off with the car.  Then, rubbing salt in the wound, TMCC reports that Brill is Pfeifer's co-deadbeat.  Brill denies any participation in the swindle and tries to persuade TMCC–and Trans Union–to recognize what he views as obvious differences between his real signature and the fake, but nobody will cut him any slack.  From Brill's perspective, this would include this court, which is dismissing his lawsuit against Trans Union.  It's not that the court lacks sympathy or empathy for Brill's situation, but the avenues of relief available to Brill do not include an FCRA claim against Trans Union.  The FCRA does not provide a basis to hold Trans Union liable for continuing to report TMCC's determinations regarding Brill and the lease extension.  The FCRA's reasonable reinvestigation requirement does not impose a legal duty on

Trans Union to consider Brill's handwriting evidence and make its own determination that TMCC's report was inaccurate.

ORDER

IT IS ORDERED that defendant Trans Union LLC's motion to dismiss, dkt. 13, is GRANTED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 16th day of December, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEFFREY BRILL
11932 West Long Circle
Littleton, CO 80127,

    *Plaintiff,*

v.              CASE  NUMBER  15-CV-300


TRANS UNION LLC
c/o The Prentice-Hall Corporation System, Inc.
8040 Excelsior Drive, Suite 400
Madison, WI 53717,

    *Defendant*.

---

## COMPLAINT

---

   The plaintiff, Jeffrey Brill, by his attorney Joel Winnig, shows the court as follows:

### I. **PARTIES**

  1. Plaintiff Jeffrey Brill (hereinafter "Brill") is an adult resident of the State of Colorado residing at 11932 West Long Circle, Littleton, Colorado 80127.

  2. Defendant Trans Union LLC (hereinafter "TransUnion") is a limited liability company whose principal office is located at 555 West Adams Street, Chicago, Illinois 60661 and whose registered agent in Wisconsin is The Prentice-Hall Corporation System, Inc., located at 8040 Excelsior Drive, Suite 400, Madison, Wisconsin 53717.

## II.   JURISDICTION and VENUE

1.   This court has jurisdiction of claims by consumers brought under 15 U.S.C. 1681 *et seq* pursuant to 15 U.S.C. §1681p.

2.   Plaintiff Jeffrey Brill is an adult citizen of the State of Colorado who formerly resided in the State of Wisconsin.

3.   Plaintiff is a consumer as defined by 15 U.S.C. §1681a(c).

4.   Defendant Trans Union LLC is a limited liability company whose principal office is in Chicago, Illinois and whose registered agent in Wisconsin is The Prentice-Hall Corporation System, Inc.

5.   Trans Union LLC operates under the brand name TransUnion and provides credit reports to credit grantors such as mortgage providers, vehicle financing providers, and charge card companies, among others.

6.   The actions giving rise to plaintiff's claims occurred primarily in the Western District of Wisconsin.

7.   15 U.S.C. 1681 et seq is commonly known as the Fair Credit Reporting Act and is sometimes referred to herein as the FCRA.

## III.   FACTUAL ALLEGATIONS

1.   On or about May 4, 2009, Brill and one Kelly A. Pfeifer (hereinafter "Pfeifer"), a person with whom Brill formerly had a close personal relationship, leased a vehicle through Smart Motors, Incorporated.

2.   The transaction took place at 5901 Odana Road, Madison, Wisconsin, which location is in the Western District of Wisconsin.

3.   The lessor was listed on the contract as Smart Motors, Inc., but the contract was, at the time of execution, assigned to Toyota Motor Credit Corporation (hereinafter "TMCC" or "Toyota").

4.   TMCC is a California corporation whose principal office is in Torrance, California.

5.     The original lease term was for 36 months and the scheduled maturity date of the lease was May 3, 2012.

6.     Brill did not sign any documents to extend his obligations on the lease.

7.     At the termination of the lease, Brill did not have possession of the vehicle.

8.     At the termination of the original lease term, the vehicle was in Pfeifer's possession.

9.     On information and belief, TMCC extended the lease for the vehicle with Pfeifer for a period of one year.

10.    Despite direct requests to Toyota, Brill has been unable to obtain any documents that explain the relationship between TMCC and Pfeifer after the termination of the original lease.

11.    Despite direct requests to Toyota, Brill has been unable to obtain any documents that explain Toyota's contention that Brill continued to be responsible on the lease.

12.    Brill believes that, on information and belief, an agent of TMCC made an agreement to allow Pfeifer continued possession of the vehicle.

13.    Brill was able to obtain a copy of a lease extension document from TMCC that explains the relationship between Toyota and Pfeifer for at least the period of May 2013 and the next succeeding six months.

14.    Brill has informed Toyota and TransUnion that he did not execute any of the documents by which Toyota maintained a payment and lease relationship with Pfeifer (and purportedly with Brill) beyond the termination date of the original lease.

15.    On information and belief, Pfeifer did not return the vehicle of which she had retained possession to Toyota at the termination of the lease extension Toyota had agreed upon with her.

16.    There was a signature on the lease extension agreement, dated May 2, 2013 that purported to be the signature of Jeffrey Brill.

17.    The signature was not Brill's.

18.     The signature was a forgery.

19.     Brill has repeatedly informed Toyota and TransUnion that his purported signature was a forgery.

20.     Toyota's financial relationship with Pfeifer after the termination of the original lease with Brill was without Brill's knowledge and without Brill's consent.

21.     When Brill informed Toyota and TransUnion that he disputed the existence of any relationship with Toyota beyond the termination of the original lease in 2012, and therefore the reporting thereof, Toyota and TransUnion failed to properly investigate his contention that any continued alleged relationship was based on a forgery.

22.     No information regarding a credit relationship between Brill and Toyota should have been reported by any credit bureaus after the termination date of the original lease.

23.     The report of such a relationship was inaccurate.

24.     Brill was required to spend money to obtain legal counsel to request that Toyota and TransUnion re-investigate the matter.

25.     The reports provided by TransUnion to creditors regarding Brill were false, inaccurate, and defamatory.

## **VIOLATIONS OF FAIR CREDIT REPORTING ACT**

26.     TransUnion is a credit reporting agency as defined by the Fair Credit Reporting Act (hereinafter "FCRA").

27.     Toyota is a furnisher of information as that term is used in Section 1681s-2 of the FCRA.

28.     Brill, through his attorney, disputed the accuracy of information that TransUnion was reporting regarding his relationship with Toyota in writing on May 20, 2014.

29.     TransUnion violated the provisions of the FCRA, specifically Section 1681i, by continuing to report that Brill had an account with Toyota that was in default, when in fact Brill had no such account because he had not been a part of any of the lease extensions entered into between

Toyota and Pfeifer, and by failing to conduct a reasonable reinvestigation to determine the information was inaccurate, even though Brill had provided directly to TransUnion proof that the information was inaccurate.

30.    TransUnion continued to report information even though they were provided with specific proof that the information they were providing was not accurate.

31.    TransUnion violated the FCRA by failing to correct and update information after they knew or should have known that the information they were providing was not complete or accurate.

32.    The violations of the FCRA by TransUnion caused significant damage to Brill.

33.    TransUnion violated its obligations under 15 U.S.C. §1681i to promptly reinvestigate Brill's dispute of the accuracy of the information it was providing regarding him when it was informed in writing in May 2014 that it was providing inaccurate information.

34.    Brill was denied credit on terms for which he would have otherwise qualified in a transaction where he purchased a vehicle because of the inaccurate reports provided by TransUnion.

35.    Brill had to make a substantially larger down payment on the vehicle than he had anticipated and thus lost more lucrative investment opportunities.

36.    Brill had to spend additional time, effort, and resources to obtain financing because he had to explain the negative, inaccurate information in his credit report that had been provided by TransUnion.

37.    Brill recently had a credit account used for business closed because the credit issuer reviewed a credit report by a credit reporting agency which provided the credit issuer with the inaccurate and incomplete information Toyota furnished to the credit reporting agencies.

38.    Brill has suffered and continues to suffer substantial stress, humiliation, worry, and other negative emotions because he does not know the next credit problem he will have because of this inaccurate credit information being reported, nor does he know if he can continue to transact normal

business while the inaccurate and incomplete information about this credit transaction is being reported.

39.    TransUnion also falsely reported that Brill had a credit relationship in which Toyota charged off $8,795 as a bad debt.

40.    TransUnion falsely reported that Toyota resolved the customer dispute.

41.    TransUnion's violation of the FCRA was, and continues to be, willful.

42.    TransUnion has been furnished with information sufficient to allow them to know that they are providing information that is incomplete, false, and defamatory, yet Toyota continues to provide that information to the public.

43.    TransUnion's actions entitle plaintiff to punitive damages pursuant to 15 U.S.C. §1681n(a)(1)(B)(2).

WHEREFORE, plaintiff demands judgment be entered against the defendant for:

a)    Actual damages;

b)    Punitive damages, costs, and reasonable attorney's fees determined by the court pursuant to 15 U.S.C. §1681 *et seq*;

c)    Injunctive relief ordering TransUnion to retract the negative information provided regarding Brill, to correct the reporting of Brill's relationship with Toyota, and correctly report the termination and nonexistence of a further relationship with Toyota after the date of the original expiration of the lease; and

d)    Such other and further relief as the court may deem just and the circumstances may warrant.

Plaintiff demands a jury trial in this matter.

Dated this 26th day of May, 2015.

___/s/_____

Joel Winnig
Attorney for Plaintiff
Wisconsin Bar No. 1018627
455 South Junction Road, Suite 200
Madison, WI  53719
(608) 829-2888

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY BRILL
11932 West Long Circle
Littleton, CO 80127,

          *Plaintiff,*

v.                                         CASE  NUMBER  15-CV-300

TRANS UNION LLC
c/o The Prentice-Hall Corporation System, Inc.
8040 Excelsior Drive, Suite 400
Madison, WI 53717,

          *Defendant.*

## AMENDED COMPLAINT

The plaintiff, Jeffrey Brill, by his attorney Joel Winnig, shows the court as follows, as his amended complaint:

## I.   <u>PARTIES</u>

1.    Plaintiff Jeffrey Brill (hereinafter "Brill") is an adult resident of the State of Colorado residing at 11932 West Long Circle, Littleton, Colorado 80127.

2.    Defendant Trans Union LLC (hereinafter "TransUnion") is a limited liability company whose principal office is located at 555 West Adams Street, Chicago, Illinois 60661 and whose registered agent in Wisconsin is The Prentice-Hall Corporation System, Inc., located at 8040 Excelsior Drive, Suite 400, Madison, Wisconsin 53717.

## II.   JURISDICTION and VENUE

1. This court has jurisdiction of claims by consumers brought under 15 U.S.C. 1681 *et seq* pursuant to 15 U.S.C. §1681p.

2. Plaintiff Jeffrey Brill is an adult citizen of the State of Colorado who formerly resided in the State of Wisconsin.

3. Plaintiff is a consumer as defined by 15 U.S.C. §1681a(c).

4. Defendant Trans Union LLC is a limited liability company whose principal office is in Chicago, Illinois and whose registered agent in Wisconsin is The Prentice-Hall Corporation System, Inc.

5. Trans Union LLC operates under the brand name TransUnion and provides credit reports to credit grantors such as mortgage providers, vehicle financing providers, and charge card companies, among others.

6. The actions giving rise to plaintiff's claims occurred primarily in the Western District of Wisconsin.

7. 15 U.S.C. 1681 et seq is commonly known as the Fair Credit Reporting Act and is sometimes referred to herein as the FCRA.

## III.   FACTUAL ALLEGATIONS

1. On or about May 4, 2009, Brill and one Kelly A. Pfeifer (hereinafter "Pfeifer"), a person with whom Brill formerly had a close personal relationship, leased a vehicle through Smart Motors, Incorporated.

2. The transaction took place at 5901 Odana Road, Madison, Wisconsin, which location is in the Western District of Wisconsin.

3. The lessor was listed on the contract as Smart Motors, Inc., but the contract was, at the time of execution, assigned to Toyota Motor Credit Corporation (hereinafter "TMCC" or "Toyota").

4. TMCC is a California corporation whose principal office is in Torrance, California.

5.   The original lease term was for 36 months and the scheduled maturity date of the lease was May 3, 2012.

6.   Brill did not sign any documents to extend his obligations on the lease.

7.   At the termination of the lease, Brill did not have possession of the vehicle.

8.   At the termination of the original lease term, the vehicle was in Pfeifer's possession.

9.   On information and belief, TMCC extended the lease for the vehicle with Pfeifer for a period of one year.

10.  Despite direct requests to Toyota, Brill has been unable to obtain any documents that explain the relationship between TMCC and Pfeifer after the termination of the original lease.

11.  Despite direct requests to Toyota, Brill has been unable to obtain any documents that explain Toyota's contention that Brill continued to be responsible on the lease.

12.  Brill believes that, on information and belief, an agent of TMCC made an agreement to allow Pfeifer continued possession of the vehicle.

13.  Brill was able to obtain a copy of a lease extension document from TMCC that explains the relationship between Toyota and Pfeifer for at least the period of May 2013 and the next succeeding six months.

14.  Brill has informed Toyota and TransUnion that he did not execute any of the documents by which Toyota maintained a payment and lease relationship with Pfeifer (and purportedly with Brill) beyond the termination date of the original lease.

15.  On information and belief, Pfeifer did not return the vehicle of which she had retained possession to Toyota at the termination of the lease extension Toyota had agreed upon with her.

16.  There was a signature on the lease extension agreement, dated May 2, 2013 that purported to be the signature of Jeffrey Brill.

17.     The signature was not Brill's.

18.     The signature was a forgery.

19.     Brill has repeatedly informed Toyota and TransUnion that his purported signature was a forgery.

20.     Toyota's financial relationship with Pfeifer after the termination of the original lease with Brill was without Brill's knowledge and without Brill's consent.

21.     Brill provided specific information to TransUnion that was sufficient to prompt a reasonable reinvestigation of his dispute that went beyond automated means and which would have gone beyond Toyota as a source of information.

22.     When Brill informed Toyota and TransUnion that he disputed the existence of any relationship with Toyota beyond the termination of the original lease in 2012, and therefore the reporting thereof, Toyota and TransUnion failed to properly investigate his contention that any continued alleged relationship was based on a forgery and identity theft.

23.     No information regarding a credit relationship between Brill and Toyota should have been reported by any credit bureaus after the termination date of the original lease.

24.     The report of such a relationship was inaccurate.

25.     Brill was required to spend money to obtain legal counsel to request that Toyota and TransUnion re-investigate the matter.

26.     The reports provided by TransUnion to creditors regarding Brill were false, inaccurate, and defamatory.

## **VIOLATIONS OF FAIR CREDIT REPORTING ACT**

27.     TransUnion is a credit reporting agency as defined by the Fair Credit Reporting Act (hereinafter "FCRA").

28.   Toyota is a furnisher of information as that term is used in Section 1681s-2 of the FCRA.

29.   Brill, through his attorney, disputed the accuracy of information that TransUnion was reporting regarding his relationship with Toyota, in writing, on May 20, 2014.

30.   TransUnion violated the provisions of the FCRA, specifically Section 1681i, by continuing to report that Brill had an account with Toyota that was in default, when in fact Brill had no such account because he had not been a part of any of the lease extensions entered into between Toyota and Pfeifer.

31.   TransUnion violated the provision of the FCRA by failing to conduct a reasonable reinvestigation to determine the information it was providing was inaccurate, even though Brill had provided directly to TransUnion proof that the information was inaccurate.

32.   TransUnion continued to report inaccurate information even though they were provided with specific proof that the information they were providing was not accurate.

33.   TransUnion violated the FCRA by failing to correct and update information after it knew or should have known that the information it was providing was not complete or accurate.

34.   TransUnion violated the FCRA by failing to *"review and consider all relevant information submitted"* by Brill. 15 U.S.C. §1681i.

35.   Brill informed TransUnion that the information reported about him was internally inaccurate, thus making it clear that a reasonable reinvestigation need to address that issue.

36.   Brill informed TransUnion specifically that TransUnion was reporting the account with Toyota as a 36 month account opened in May 2009.

37.   Brill informed TransUnion specifically that TransUnion was further reporting the account with Toyota as having past due payments almost five years after the account was opened and while TransUnion was reporting the account as a 36 month account.

38. This report from Brill alerted TranUnion to the likelihood that a reasonable reinvestigation as required by law would require more than a automated consumer dispute verification.

39. This report from Brill alerted TransUnion to the likelihood that the information TransUnion received from Toyota was not reliable.

40. Brill provided information to TransUnion in writing that proved, in fact, he had no debt to Toyota.

41. Brill provided documents to TransUnion to show that he had no debt to Toyota.

42. Brill provided documents and analysis to TransUnion that were sufficient to alert TransUnion to the fact that forged documents existed that purported to extend the term of Brill's lease agreement with Toyota.

43. Brill informed TransUnion that he signed his name using the middle initial "D." even in places where his name was not typed with the middle initial.

44. Brill provided documents to TransUnion that provided proof that he normally signed as indicated above.

45. Brill informed TransUnion that the signature on the purported lease extension lacked his distinctive "D", thus putting TransUnion on notice that there were facts that a reasonable reinvestigation could uncover regarding the alleged liability TransUnion was reporting.

46. Brill provided TransUnion with at least four points of handwriting analysis of his signature that were sufficient to alert TransUnion to the fact that Brill was correct in asserting that his signature was forged.

47. While credit reporting agencies may not be required to analyze hand writing in every case of a claimed forgery, in this case, because of the specific information provided by Brill, TransUnion had to take reasonable steps to determine the issue of forgery or identity theft to which Brill had alerted TransUnion.

48.     Brill also alerted TransUnion that there were employees or agents of Toyota that dealt with Pfeifer who were likely to have information to verify that Brill was the victim of a forgery.

49.     Brill provided enough information to TransUnion that any reasonable reinvestigation required TransUnion to go beyond Toyota as the source of information to resolve the dispute.

50.     Brill alerted TransUnion to not only the possibility, but the likelihood, if not the indisputable truth, that Toyota was an unreliable reporter of information about the account.

51.     Brill provided sufficient information to TransUnion for TransUnion to know of not only the possibility, but the likelihood, if not the indisputable truth, that Toyota was an unreliable reporter of information about the account.

52.     TransUnion knew that the information it was reporting would be regarded as very negative by existing and potential creditors of Brill.

53.     The likelihood of harm to Brill was very high, thus requiring TransUnion to complete a more thorough investigation than the minimal automated consumer dispute verification.

54.     On information and belief, TransUnion did nothing more than provide Toyota an opportunity to respond to by automated means.

55.     Had TransUnion reasonably investigated Brill's dispute and followed up in a logical fashion the specific information provided, including the internal inconsistency of TransUnion's current reporting, it could have easily uncovered the facts that would show it was inaccurately reporting credit information about Brill and his account with Toyota.

56.     No reasonable reinvestigation of a dispute premised on forgery, a form of identity theft, can consist of merely asking the creditor to verify identifying information.

57.     On information and belief, all TransUnion did is what is described in the immediately preceding paragraph.

Brill Complaint against TransUnion LLC                              Page **7** of **10**

CASE NUMBER 15-CV-300

58.   Brill was not complaining that Toyota did not have an account with him originally.

59.   Brill was complaining that Toyota claimed to have a account with him after he terminated his relationship with Toyota by successfully fulfilling all his obligations under the 36 month account TransUnion was reporting, and that such claim was inaccurate.

60.   There was no chance that TransUnion's reinvestigation was reasonable. See Cornock v. Trans Union LLC, 638 F. Supp. 2d 158, 167 (D.N.H. 2009).

61.   The violations of the FCRA by TransUnion caused significant damage to Brill.

62.   TransUnion violated its obligations under 15 U.S.C. §1681i to promptly reinvestigate Brill's dispute of the accuracy of the information it was providing regarding him when it was informed in writing in May 2014 that it was providing inaccurate information.

63.   Brill was denied credit on terms for which he would have otherwise qualified in a transaction where he purchased a vehicle because of the inaccurate reports provided by TransUnion.

64.   Brill had to make a substantially larger down payment on the vehicle than he had anticipated and thus lost more lucrative investment opportunities.

65.   Brill had to spend additional time, effort, and resources to obtain financing because he had to explain the negative, inaccurate information in his credit report that had been provided by TransUnion.

66.   Brill recently had a credit account used for business closed because the credit issuer reviewed a credit report by a credit reporting agency which provided the credit issuer with the inaccurate and incomplete information Toyota furnished to the credit reporting agencies.

67.   Brill has suffered and continues to suffer substantial stress, humiliation, worry, and other negative emotions because he does not know the next credit problem he will have because of this inaccurate credit information being reported, nor does he know if he can continue to transact normal

Brill Complaint against TransUnion LLC                          Page **8** of **10**

CASE NUMBER 15-CV-300

business while the inaccurate and incomplete information about this credit transaction is being reported.

68.    TransUnion also falsely reported that Brill had a credit relationship in which Toyota charged off $8,795 as a bad debt.

69.    TransUnion falsely reported that Toyota resolved the customer dispute.

70.    TransUnion's violation of the FCRA was, and continues to be, willful.

71.    TransUnion has been furnished with information sufficient to allow them to know that they are providing information that is incomplete, false, and defamatory, yet Toyota continues to provide that information to the public.

72.    TransUnion's actions entitle plaintiff to punitive damages pursuant to 15 U.S.C. §1681n(a)(1)(B)(2).

WHEREFORE, plaintiff demands judgment be entered against the defendant for:

a)    Actual damages;

b)    Punitive damages, costs, and reasonable attorney's fees determined by the court pursuant to 15 U.S.C. §1681 *et seq*;

c)    Injunctive relief ordering TransUnion to retract the negative information provided regarding Brill, to correct the reporting of Brill's relationship with Toyota, and correctly report the termination and nonexistence of a further relationship with Toyota after the date of the original expiration of the lease, or in lieu thereof, compensation for reasonably likely future damages; and

d)    Such other and further relief as the court may deem just and the circumstances may warrant.

Plaintiff demands a jury trial in this matter.

Dated this 2nd day of August, 2015.

\_\_\_/s/_____

Joel Winnig
Attorney for Plaintiff
Wisconsin Bar No. 1018627
455 South Junction Road, Suite 200
Madison, WI  53719
(608) 829-2888

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WISCONSIN

JEFFREY BRILL,

                  Plaintiff,

      vs.

TRANS UNION LLC,

                  Defendant.

CASE NO. 3:15-cv-00300-slc

Magistrate Judge Stephen L. Crocker

## NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Jeffrey Brill, the plaintiff herein, by his attorney Joel Winnig, appeals to the United States Court of Appeals for the Seventh Circuit from judgment dated December 16, 2015 entered in favor of defendant Trans Union LLC, which judgment granted defendant's motion to dismiss and closed the case. The judgment was based on an order granting defendant's motion to dismiss dated December 16, 2015. The parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

*Trans Union, LLC, Defendant*

Scott E. Brady
William R. Brown, Esq.
Schuckit & Associates, P.C.
4545 Northwestern Drive
Zionsville, IN  46077
Telephone:  317-363-2400
Fax:  317-363-2257
E-Mail:  wbrown@schuckitlaw.com

*Counsel for Defendant, Trans Union, LLC*

*Jeffrey Brill, Plaintiff*

Joel Winnig

State Bar No. 1018627
414 D'Onofrio Drive, Suite 120
Madison, WI 53719
Telephone: 608-829-2888
Fax:  608-829-2802
E-Mail: joel@joelwinnig.com

*Counsel for Plaintiff*

Respectfully submitted,


Date:  1.14.2016                              /s/_____
                                             Joel Winnig,
                                             Attorney for Plaintiff
                                             State Bar No. 1018627
                                             414 D'Onofrio Drive, Suite 120
                                             Madison, WI 53719
                                             Telephone: 608-829-2888
                                             Fax:  608-829-2802
                                             E-Mail: joel@joelwinnig.com

3015, APPEAL, CLOSED, CONSENTED, KO, LS,

# U.S. District Court
## Western District of Wisconsin (Madison)
## CIVIL DOCKET FOR CASE #: 3:15-cv-00300-slc

| | |
|---|---|
| Brill, Jeffrey v. Trans Union LLC | Date Filed: 05/20/2015 |
| Assigned to: Magistrate Judge Stephen L. Crocker | Date Terminated: 12/16/2015 |
| Cause: 15:1681 Fair Credit Reporting Act | Jury Demand: Plaintiff |
| | Nature of Suit: 480 Consumer Credit |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Jeffrey Brill**      represented by    **Joel Bruce Winnig**
JOEL BRUCE WINNIG SC
455 County Road M
Suite 200
Madison, WI 53719
608-829-2888
Fax: 608-829-2802
Email: winniglaw@tds.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Trans Union LLC**      represented by    **William R. Brown**
Schuckit & Associates, P.C.
4545 Northwestern Drive
Zionsville, IN 46077
317-363-2400
Fax: 317-363-2257
Email: wbrown@schuckitlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Edwin Brady**
Schuckit & Associates, P.C.
4545 Northwestern Drive
Zionsville, IN 46077
317-363-2400
Fax: 317-363-2257
Email: sbrady@schuckitlaw.com
*ATTORNEY TO BE NOTICED*

A 32

ECF Western District of Wisconsin                    https://ecf.wiwd.circ7.dcn/cgi-bin/DktRpt.pl?924700074889752-L_1_0-1

Case: 3:15-cv-00300-slc   Document #: 25-3   Filed: 01/15/16   Page 2 of 4
Case: 16-1091        Document: 13        Filed: 04/18/2016      Pages: 81

| Date Filed | # | Docket Text |
|---|---|---|
| 05/26/2015 | 1 | COMPLAINT against Jeffrey Brill. ( Filing fee $ 400 receipt number 0758-1562384.), filed by Jeffrey Brill. (Attachments: # 1 Summons, # 2 JS-44 Civil Cover Sheet) (Winnig, Joel) (Entered: 05/26/2015) |
| 05/26/2015 | | Case randomly assigned to Magistrate Judge Stephen L. Crocker. (kwf) (Entered: 05/26/2015) |
| 05/26/2015 | | Standard attachments for Magistrate Judge Stephen L. Crocker required to be served on all parties with summons or waiver of service: Corporate Disclosure Statement, Order Regarding Assignment of Civil Cases, Notice of Assignment to a Magistrate Judge and Consent/Request for Reassignment, Order on Dispositive Motions. (kwf) (Entered: 05/26/2015) |
| 05/26/2015 | 2 | Summons Issued as to Trans Union LLC. (kwf) (Entered: 05/26/2015) |
| 06/05/2015 | 3 | Notice of Appearance filed by William R. Brown for Defendant Trans Union LLC. (Brown, William) (Entered: 06/05/2015) |
| 06/05/2015 | 4 | Corporate Disclosure Statement by Defendant Trans Union LLC. (Brown, William) (Entered: 06/05/2015) |
| 06/18/2015 | 5 | Joint Stipulation to Extend Trans Union, LLC's Time To Respond To Plaintiff's Complaint by Defendant Trans Union LLC. (Brown, William) (Entered: 06/18/2015) |
| 06/23/2015 | 6 | ** TEXT ONLY ORDER ** ORDER accepting and entering 5 Joint Stipulation to Extend Trans Union, LLC's Time To Respond To Plaintiff's Complaint. Signed by Magistrate Judge Stephen L. Crocker on 6/23/2015. (kwf) (Entered: 06/23/2015) |
| 06/23/2015 | | Reset Deadlines: Trans Union LLC answer due 7/24/2015. (kwf) (Entered: 06/23/2015) |
| 07/02/2015 | 7 | Corporate Disclosure Statement by Defendant Trans Union LLC. (Brown, William) (Entered: 07/02/2015) |
| 07/21/2015 | 8 | **MOTION TO DISMISS** *Plaintiff's Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* by Defendant Trans Union LLC. Brief in Opposition due 8/11/2015. Brief in Reply due 8/21/2015. (Brown, William) (Entered: 07/21/2015) |
| 07/21/2015 | 9 | Brief in Support of 8 Motion to Dismiss *Plaintiff's Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* by Defendant Trans Union LLC. (Brown, William) (Entered: 07/21/2015) |
| 07/22/2015 | | Set Telephone Pretrial Conference: Telephone Pretrial Conference set for 8/26/2015 at 01:00 PM before Magistrate Judge Stephen L. Crocker. Counsel for Plaintiff responsible for setting up the call to chambers at (608) 264-5153. [Standing Order Governing Preliminary Pretrial Conference attached] (kwf) (Entered: 07/22/2015) |

A 33

ECF Western District of Wisconsin                                    https://ecf.wiwd.circ7.dcn/cgi-bin/DktRpt.pl?924700074889752-L_1_0-1

Case: 3:15-cv-00300-slc   Document #: 25-3   Filed: 01/15/16   Page 3 of 4
Case: 16-1091       Document: 13       Filed: 04/18/2016       Pages: 81

| 07/22/2015 | | Set Deadlines: Consent/Request for Reassignment forms due 8/11/2015. (slc/kwf) (Entered: 07/22/2015) |
|---|---|---|
| 07/24/2015 | 10 | Motion to Admit Scott Edwin Brady Pro Hac Vice. ( Pro Hac Vice fee $ 50 receipt number 0758-1601051.) by Defendant Trans Union LLC. (Brady, Scott) (Entered: 07/24/2015) |
| 07/24/2015 | 11 | ** TEXT ONLY ORDER ** <br> ORDER granting 10 Motion to Admit Scott Edwin Brady Pro Hac Vice. Signed by Magistrate Judge Peter A. Oppeneer on 7/24/2015. (lak) (Entered: 07/24/2015) |
| 08/02/2015 | 12 | AMENDED COMPLAINT against Trans Union LLC, filed by Jeffrey Brill. (Winnig, Joel) (Entered: 08/02/2015) |
| 08/18/2015 | 13 | **MOTION TO DISMISS *Plaintiff's Amended Complaint (Doc. No. 12) For Failure To State A Claim Upon Which Relief Can Be Granted*** by Defendant Trans Union LLC. Brief in Opposition due 9/8/2015. Brief in Reply due 9/18/2015. (Brady, Scott) Modified on 8/19/2015. (lak) (Entered: 08/18/2015) |
| 08/18/2015 | 14 | Brief in Support of 13 Motion to Dismiss *Plaintiff's Amended Complaint (Doc. No. 12) For Failure To State A Claim Upon Which Relief Can Be Granted* by Defendant Trans Union LLC. (Brady, Scott) Modified on 8/19/2015. (lak) (Entered: 08/18/2015) |
| 08/21/2015 | 15 | Joint Preliminary Pretrial Conference Report by Plaintiff Jeffrey Brill. (Winnig, Joel) (Entered: 08/21/2015) |
| 08/26/2015 | 16 | Disregard. See Dkt. 17 . Modified on 8/26/2015 (jls). (Entered: 08/26/2015) |
| 08/26/2015 | 17 | Supplemental Joint Preliminary Pretrial Conference Report by Plaintiff Jeffrey Brill. (Winnig, Joel) (Entered: 08/26/2015) |
| 08/31/2015 | | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Preliminary Pretrial Conference held on 8/26/2015. [:15] (kwf) (Entered: 08/31/2015) |
| 08/31/2015 | 18 | Pretrial Conference Order - Briefing on pending Motion to Dismiss: Response due 9/16/2015, Reply due 9/30/2015. Dispositive Motions due 4/25/2016. Settlement Letters due 8/19/2016. Motions in Limine due 8/26/2016. Response to Motions due 9/9/2016. Telephone Final Pretrial Conference set for 9/21/2016 at 03:00 PM, with Counsel for Plaintiff responsible for setting up the call to chambers at (608) 264-5153. Jury Selection and Trial set for 9/26/2016 at 09:00 AM. Signed by Magistrate Judge Stephen L. Crocker on 8/28/2015. (kwf) (Entered: 08/31/2015) |
| 08/31/2015 | | Reset Briefing Deadlines as to 13 MOTION TO DISMISS *Plaintiff's Amended Complaint (Doc. No. 12) For Failure To State A Claim Upon Which Relief Can Be Granted*. Brief in Opposition due 9/16/2015. Brief in Reply due 9/30/2015. (kwf) (Entered: 08/31/2015) |
| 09/16/2015 | 19 | Brief in Opposition by Plaintiff Jeffrey Brill re: 13 Motion to Dismiss, filed by Trans Union LLC. (Winnig, Joel) (Entered: 09/16/2015) |
| 09/29/2015 | 20 | Brief in Reply by Defendant Trans Union LLC in Support of 13 Motion to Dismiss *For Failure To State A Claim Upon Which Relief Can Be Granted*. (Brady, Scott) |

A 34

ECF Western District of Wisconsin                    https://ecf.wiwd.circ7.dcn/cgi-bin/DktRpt.pl?924700074889752-L_1_0-1

Case: 3:15-cv-00300-slc   Document #: 25-3   Filed: 01/15/16   Page 4 of 4
Case: 16-1091      Document: 13      Filed: 04/18/2016      Pages: 81

| | | (Entered: 09/29/2015) |
|---|---|---|
| 12/16/2015 | 21 | OPINION and ORDER granting defendant Trans Union LLC's 13 Motion to Dismiss. The clerk of court is directed to enter judgment for defendant and close this case. Signed by Magistrate Judge Stephen L. Crocker on 12/16/2015. (kwf) (Entered: 12/16/2015) |
| 12/16/2015 | 22 | JUDGMENT entered in favor of defendant Trans Union LLC against plaintiff Jeffrey Brill granting defendant's motion to dismiss and closing the case. (kwf) (Entered: 12/16/2015) |
| 01/14/2016 | 23 | NOTICE OF APPEAL by Plaintiff Jeffrey Brill as to 22 Judgment, 21 Order on Motion to Dismiss. Filing fee of $ 505, receipt number 0758-1720096 paid. No Docketing Statement filed. (Winnig, Joel) (Entered: 01/14/2016) |
| 01/15/2016 | 24 | Appeal Information Packet. (lak) (Entered: 01/15/2016) |

A 35